**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

TOOLS USA AND EQUIPMENT
COMPANY,
<u>Plaintiff-Appellee,</u>

v.                                                          No. 95-1698

CHAMP FRAME STRAIGHTENING
EQUIPMENT, INCORPORATED,
<u>Defendant-Appellant.</u>

Appeal from the United States District Court
for the Middle District of North Carolina, at Greensboro.
William L. Osteen, Sr., District Judge.
(CA-93-137-2)

Argued: May 9, 1996

Decided: July 2, 1996

Before WIDENER, NIEMEYER, and MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Widener and Judge Niemeyer joined.

_____

**COUNSEL**

**ARGUED:** Thomas Matthew Clare, TEAGUE, CAMPBELL, DEN-
NIS & GORHAM, Raleigh, North Carolina, for Appellant. Jack Wil-
liam Floyd, FLOYD, ALLEN & JACOBS, L.L.P., Greensboro, North
Carolina, for Appellee. **ON BRIEF:** Karen K. Prather, TEAGUE,
CAMPBELL, DENNIS & GORHAM, Raleigh, North Carolina, for

Appellant. Robert V. Shaver, Jr., FLOYD, ALLEN & JACOBS, L.L.P., Greensboro, North Carolina, for Appellee.

_____

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

Tools USA and Equipment Company brought this action against Champ Frame Straightening Equipment alleging trade dress infringement and unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1994), and deceptive or unfair trade practices under state law. The jury returned a verdict in favor of Tools USA, finding that Champ had infringed on Tools USA's trade dress. Asserting that there was insufficient evidence to support the jury's verdict, Champ appeals. Because Tools USA presented sufficient evidence that its trade dress was non-functional and had acquired a secondary meaning, and that Champ's infringement created a likelihood of confusion, we affirm.

I.

Tools USA, a North Carolina corporation, engages in the mail order sale of tools and equipment through catalogs distributed to auto body shops nationwide. Champ Frame Straightening Equipment, a California corporation, manufactures and sells frame straightening equipment, and also engages in the mail order sale of tools and equipment through catalogs distributed to auto body shops throughout the country.

Tools USA began publishing its "Tools USA and Equipment" catalog in 1988. Until Champ introduced its "Auto Body Toolmart" catalog in 1991, Tools USA was the only company distributing a catalog of tools and equipment directly to auto body shops. By 1994, Tools USA was mailing over 80,000 copies of each issue of its catalog to a group of customers that included almost every identifiable auto body shop in the country. At that time, Champ was mailing over 67,000 copies of each issue of its catalog to many of the same businesses.

2

Tools USA's complaint alleged that its catalog has a distinctive design and trade dress. Listing several similarities between the "Tools USA and Equipment" catalog and Champ's "Auto Body Toolmart" catalog, Tools USA charged that Champ had infringed on Tools USA's trade dress. The jury agreed and assessed damages in the amount of $38,387.19. The district court, having denied Champ's motion for judgment as a matter of law at the conclusion of Tools USA's case, also denied Champ's renewed motion following the jury verdict. The parties had stipulated that Tools USA's claim for unfair or deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1 would not be submitted to the jury but that if the jury awarded damages to Tools USA for trade dress infringement, those damages would be trebled pursuant to N.C. Gen. Stat. § 75-16. Accordingly, the court entered judgment in favor of Tools USA in the amount of $115,161.57. The court also entered a permanent injunction, enjoining Champ from publishing its catalog without making certain modifications.[1]

II.

Champ argues that the district judge erred in denying its motions for judgment as a matter of law with respect to both liability and damages. A court may only grant a motion for judgment as a matter of law (formerly j.n.o.v., see O'Neal v. Celanese Corp., 10 F.3d 249, 250 (4th Cir. 1993)) if, viewing the evidence in the light most favorable to the non-moving party and drawing every legitimate inference in that party's favor, the court "determine[s] that the only conclusion a reasonable trier of fact could draw from the evidence is in favor of the moving party." Winant v. Bostic, 5 F.3d 767, 774 (4th Cir. 1993). See also O'Neal, 10 F.3d at 250; Anheuser-Busch, Inc. v. L & L Wings, Inc., 962 F.2d 316, 318 (4th Cir.), cert. denied, 506 U.S. 872 (1992). We review a grant or denial of a motion for judgment as a matter of law de novo. Trandes Corp. v. Guy Atkinson Co., 996 F.2d 655, 661 (4th Cir.), cert. denied, 114 S. Ct. 443 (1993).

_____

[1] Although in its brief Champ includes the district court's asserted error in issuing a permanent injunction as one of the "issues presented for review," it provides no argument on the issue. At oral argument, Champ's counsel acknowledged that Champ had complied with the injunction and did not seek any relief with regard to it.

"`Trade dress' involves the total image of a product, and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 764 n.1 (1992) (quoting John C. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 980 (11th Cir. 1983)). See also Restatement (Third) of Unfair Competition § 16 cmt. a (1995). Section 43(a) of the Lanham Act, 15 U.S.C.§ 1125(a), creates a federal cause of action for trade dress infringement. See Elmer v. ICC Fabricating, Inc., 67 F.3d 1571, 1578 (Fed. Cir. 1995); John C. Harland Co., 711 F.2d at 980. See also Two Pesos, 505 U.S. at 773.

A claim of trade dress infringement requires proof of three elements: (1) the trade dress is primarily non-functional;[2] (2) the trade dress is inherently distinctive or has acquired a secondary meaning; and (3) the alleged infringement creates a likelihood of confusion. See Two Pesos, 505 U.S. at 765-67. See also Elmer, 67 F.3d at 1578; Computer Care v. Service Systems Enters., 982 F.2d 1063, 1067-68 (7th Cir. 1992); Woodsmith Publishing Co. v. Meredith Corp., 904 F.2d 1244, 1247 (8th Cir. 1990); Allied Marketing Group, Inc. v. CDL Marketing, Inc., 878 F.2d 806, 813 (5th Cir. 1989); Hartford House, Ltd. v. Hallmark Cards, Inc., 846 F.2d 1268, 1271 (10th Cir.), cert. denied, 488 U.S. 908 (1988); American Home Products Corp. v. Barr Labs, Inc., 834 F.2d 368, 370 (3rd Cir. 1987); Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 842 (9th Cir. 1987); Harlequin Enters. v. Gulf & Western Corp., 503 F. Supp. 647, 649 (S.D.N.Y. 1980), aff'd, 644 F.2d 946 (2nd Cir. 1981).

_____

[2] The circuits are divided as to which party bears the burden of proof on the question of functionality. See generally Danielle Rubano, Note, Trade Dress: Who Should Bear the Burden of Proving or Disproving Functionality in a Section 43(a) Infringement Claim? , 6 Fordham Intell. Prop., Media & Ent. L.J. 345 (1995) (collecting cases). We have yet to address this issue, and need not do so here. In the instant case, the district court instructed the jury that Champ had the burden of proving functionality. Champ has not appealed this instruction, and thus the issue is not now before us.

III.

The district court submitted to the jury special interrogatories, which required the jury to make separate findings as to each element of trade dress infringement. The jury first found that the Tools USA catalog's trade dress was non-functional. The jury then found that although the trade dress was not inherently distinctive and had not been intentionally copied, it had acquired a secondary meaning by the time Champ introduced its Toolmart catalog. Finally, the jury found that there was a likelihood of confusion created by the similarities in the parties' catalogs. Champ now claims that the jury erred in its findings as to each of the three elements necessary to establish a trade dress claim. We address each element in turn.

A.

"[A] product feature is functional if it is essential to the use or purpose of the article or it affects the cost or quality of the article." Inwood Laboratories, Inc. v. Ives Laboratories, Inc. , 456 U.S. 844, 850 n.10 (1982). In other words, a feature is functional "if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." Qualitex Co. v. Jacobson Products Co., 115 S. Ct. 1300, 1304 (1995). See also , Clamp Mfg. Co. v. Enco Mfg. Co., 870 F.2d 512, 516 (9th Cir.) ("Functional features of a product are features which constitute the actual benefit that the customer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product") (internal quotations and citations omitted), cert. denied , 493 U.S. 872 (1989). The non-functionality requirement for trademark or trade dress protection "prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." Qualitex, 115 S. Ct. at 1304.

In support of its argument that the jury erred in finding that Tools USA's trade dress was non-functional, Champ focuses on individual aspects of the "Tools USA" catalog trade dress. Champ explains at some length why it believes each feature is functional. This tactic ignores the fact that the critical functionality inquiry is not whether each individual component of the trade dress is functional, but rather

5

whether the trade dress <u>as a whole</u> is functional. <u>See LeSportsac, Inc. v. K Mart Corp.</u>, 754 F.2d 71, 76 (2nd Cir. 1985) ("by breaking [plaintiff's] trade dress into its individual elements and then attacking certain of those elements as functional, [defendant] misconceives the scope of the appropriate inquiry"); <u>Fuddruckers</u>, 826 F.2d at 842 ("We examine trade dress as a whole to determine its functionality; functional elements that are separately unprotectable can be protected together as part of a trade dress") (internal citation omitted); <u>Hartford House</u>, 846 F.2d at 1272 ("a trade dress may be a composite of several features in a certain arrangement or combination which produces an overall distinctive appearance. In this context, the question is whether the combination of features comprising the trade dress is functional"); <u>AmBrit, Inc. v. Kraft, Inc.</u>, 812 F.2d 1531, 1538 (11th Cir.) ("That individual elements of packaging are functional does not, however, render the package as a whole unprotect[a]ble"), <u>cert. denied</u>, 481 U.S. 1041 (1983).

The trade dress of the Tools USA catalog consists of a number of elements, combined in a particular fashion. Consequently, the fact that, for example, newsprint provides the most economical type of paper on which to print a catalog, and is thus functional, does not render the catalog's trade dress, as a whole, functional. Tools USA does not seek to prevent its competitors from printing their catalogs on newsprint; it seeks only to protect its "particular configuration of design features." <u>LeSportsac</u>, 754 F.2d at 77. Tools USA's "particular configuration of design features" includes, <u>inter alia</u>, (1) the use of a "stars and stripes" logo designed around the catalog name, appearing prominently at the top of the cover page and in smaller form on each subsequent page; (2) an ordering information box featuring the logos of accepted credit cards at the bottom of the cover page; (3) the phrase "ATTENTION: BODY SHOP MANAGERS" in capital letters at the bottom of the cover page; (4) the use of newsprint as printing material; (5) the use of boxes around the photographs and descriptions of items offered for sale; and (6) the use of a"banner" containing ordering instructions across the bottom of each page. Champ cites no evidence, and offers no argument beyond conclusory statements, suggesting that this trade dress, as a whole, is functional.**3**

_____
**3** Champ asserts that, because Tools USA has made changes to its catalog over time, the catalog "does not have a consistent overall look." Brief

6

Tellingly, Champ also makes no argument as to why the use of the "stars and stripes" logo, even examined by itself, should be considered functional. Indeed, Champ's president conceded at trial that its use was not "fundamental to the design of the catalogue" and "was not included in the original concept of our catalogue." He acknowledged, "[i]t was a device that I added later, because I saw Tools USA was using this device and I wanted to use it too."

As noted above, Champ does maintain, however, that many of the other features, individually, are functional. Even if this were the correct inquiry, which it is not, Champ's arguments are unpersuasive. For example, Champ asserts that "the telephone number and facsimile number on every page of the catalog are functional as they provide easy access to information for the customer . . . ." Brief of Appellant at 20. The problem is that while this information may be functional, its placement in a "banner" format across the bottom of each page is not. Because the functionality requirement is directed at the extent to which protecting a particular feature would hinder competition, see Qualitex, 115 S. Ct. at 1304, one test for functionality is the availability to competitors of alternative options.[4] A myriad of methods of conveying ordering information to customers do not involve the use

_____

of Appellant at 22. However, the changes appear to be slight, and the jury would certainly have been justified in concluding that the changes did not alter the overall trade dress of the catalog. Nor does Woodsmith, 904 F.2d at 1248, on which Champ principally relies for its functionality argument, hold otherwise. The discussion of functionality in Woodsmith is dicta. The district court in Woodsmith had held that there was a question of fact as to functionality but granted the defendants summary judgment because plaintiff had produced insufficient evidence of likelihood of confusion; the Eighth Circuit simply affirmed that holding. Id. at 1250.

**4** See, e.g., Hartford House, 846 F.2d at 1273 ("the availability of alternative appealing designs is a key factor in determining that a trade dress is nonfunctional"). See also Restatement (Third) of Unfair Competition § 17 ("a design is `functional'. . . if the design affords benefits in the manufacturing, marketing, or use of the goods or services with which the design is used, apart from any benefits attributable to the design's significance as an indication of source, that are important to effective competition by others and that are not practically available through the use of alternative designs") (emphasis added).

7

of a banner across the bottom of each page of a catalog. Thus, even if the test for functionality permitted examination of each individual component of a plaintiff's trade dress, the jury would have been justified in determining that the use of the ordering information banner at the bottom of each page was non-functional.

For the same reasons, the jury would have been justified in concluding that the particular size, shape, and location of the credit card box on the front cover of Tools USA's catalog was non-functional, despite the fact that the inclusion of credit card information is functional. Indeed, Champ's president acknowledged as much at trial, when he testified "You could put it [the credit card information] in different places in the catalog."

Champ maintains that "the phrase `Attention Body Shop Managers' constitutes a functional feature because it is included in the catalog to direct the catalog to the attention of the person most likely to purchase products from it." Brief of Appellant at 20. This argument misconceives the functionality inquiry, which looks for features that are not merely useful, but rather "essential to the use or purpose of the article," Inwood Labs, 456 U.S. at 850 n.10, so that their exclusive use by one party "would put competitors at a significant non-reputation-related disadvantage." Qualitex, 115 S. Ct. at 1304. Champ has shown nothing more than that the words "Attention Body Shop Managers" might be useful. There are certainly other means to direct the catalog to the attention of the shop manager, without using the exact wording, the same typeface, and a location like that used in the Tools USA catalog.

Champ offers similar arguments as to the functionality of other individual features of the Tools USA catalog, but all of these arguments are equally meritless in light of the relevant inquiry. The Tools USA catalog's trade dress combines functional and non-functional features. Looking, as we must, at the overall trade dress rather than at individual features, we cannot say that a reasonable jury could only have concluded that the trade dress was functional. See Computer Care, 982 F.2d at 1071 (noting that, although certain elements of a company's monthly reports were functional, the "district court did not err in concluding that the `combination and arrangement' of features in [the] reports is not functional").

8

B.

Champ asserts that Tools USA failed to prove that its trade dress had acquired a secondary meaning.

> If a particular product's trade dress has acquired a secondary meaning, then the consuming public associates that product with a certain producer, and, most importantly, is likely to make that same association when the trade dress is used on another producer's product. The public need not be able to identify the name of the manufacturer that produces the product; it is enough if the public perceives that the product emanates from a single source.

M. Kramer Mfg. v. Andrews, 783 F.2d 421, 449 (4th Cir. 1986). In determining whether a product's trade dress has acquired secondary meaning, a court considers four factors: "(1) long use; (2) advertising; (3) sales volume; and (4) identity of service or origin in the minds of the purchasing public." Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1528 n.3 (4th Cir. 1984), cited in Nabisco Brands, Inc. v. Conusa Corp., 722 F. Supp. 1287, 1290 n.3 (M.D.N.C.), aff'd, 892 F.2d 74 (4th Cir. 1989).

The evidence as to the first three factors, while perhaps not over-whelming, supports the jury's finding that Tools USA's trade dress had acquired a secondary meaning. As to the first factor, it is undis-puted that Tools USA's catalog had been in existence for approxi-mately three years before Champ began publishing its catalog. As to the second, although there does not appear to be any evidence that Tools USA conducted any advertising campaign separate from its cat-alog, advertisement of one's products constitutes the very purpose of a catalog. Tools USA's catalog was mailed directly to over 80,000 potential customers in 1994. With respect to sales volume, the third factor, Champ notes that Tools USA's sales have increased every year since 1989, with gross sales of approximately $3.5 million in 1993.

Only the fourth factor seems to be seriously disputed in this case. Evidence offered as to actual customer confusion, although also pro-bative of likelihood of confusion, certainly tends to show that the rele-vant purchasing public associated Tools USA's trade dress with Tools

9

USA. For example, customer Larry Overby testified that he had discussed a particular piece of equipment on the telephone with Tools USA's president, Clyde White. He subsequently received Champ's "Auto Body Toolmart" catalog, and became confused when the catalog featured the equipment at a different price than had been quoted to him. Believing the Champ "Toolmart" catalog to be a Tools USA catalog, he took it with him to the Tools USA warehouse to resolve the discrepancy. He showed the catalog to White, who informed him that it was not Tools USA's catalog. Customer Sid Lowe testified as to a comparable experience. Similarly, customer Richard Draughn testified that he received the Toolmart catalog and, thinking it was a Tools USA catalog, threw away the previous issue of the Tools USA catalog, as was his practice whenever a new issue came out. Even Champ's president, Michael Doughty, acknowledged at trial that "there is no doubt" that there was confusion in the marketplace and that "this confusion [wa]s created by" the two catalogs.

In light of this and other evidence as to customer confusion, a reasonable jury could have found that Tools USA's trade dress had acquired a secondary meaning.

C.

Champ maintains that Tools USA failed to present sufficient evidence to show that the similarities between the two catalogs created a likelihood of confusion. Champ asserts that "a visual inspection of plaintiff's and defendant's catalogs reveal[s] that there is no likelihood of confusion since the catalogs are distinct in appearance." Brief of Appellant at 28. A visual inspection of the catalogs is certainly a way to evaluate "the similarity of the trade dresses," which is one of the factors to be considered "[i]n assessing the likelihood of marketplace confusion." See Badger Meter, Inc. v. Grinnell Corp., 13 F.3d 1145, 1152 (7th Cir. 1994) (internal quotation and citation omitted). See also, Woodsmith, 904 F.2d at 1249 ("Visual inspection is permissible as an aid to a district court's determination of likelihood of confusion, but should not constitute the sole basis for the conclusions made"). In this case, although the two catalogs do differ in some respects, visual inspection of them does not lead to the inescapable conclusion that there is no likelihood of confusion.

10

Moreover, evidence of actual customer confusion "is patently the best evidence of likelihood of confusion." Allied Marketing Group, Inc. v. CDL Marketing, Inc., 878 F.2d 806, 813 (5th Cir. 1989) (quoting Chevron Chem. Co. v. Voluntary Purchasing Groups, 659 F.2d 695, 704 (5th Cir. 1981), cert. denied, 457 U.S. 1126 (1982)). Actual confusion can be demonstrated by survey evidence, but contrary to Champ's suggestion, survey evidence is not necessarily the best evidence of actual confusion and "surveys are not required to prove likelihood of confusion." Woodsmith, 904 F.2d at 1249.

Although Tools USA presented no survey evidence of consumer confusion, it did provide abundant evidence of incidents of actual confusion. In addition to the testimony of individual customers discussed above, Tools USA introduced the testimony of several of its employees regarding actual customer confusion. For example, Jeanette Smith, who handles customer complaints at Tools USA, testified that over about an eighteen month period, she received approximately seventy-five calls from customers complaining about late or incomplete shipments, which turned out to have been ordered not from Tools USA but from Champ (Auto Body Toolmart).

Similarly, Tools USA salesman Steve Kalill testified that he had received approximately 150 to 200 calls from confused customers over a two and a half to three year period. He described one specific occasion in which a customer calling about a late shipment was so convinced that he was talking to the right company that he faxed Kalill a copy of his credit card authorization. Upon receiving the fax, Kalill noted that it was a credit card authorization contract from Auto Body Toolmart.

Another salesman, Lee Acres, testified that in the nine months prior to the trial, he received approximately three telephone calls a day from customers confused between Tools USA and Auto Body Toolmart. He gave an example of a telephone call he received from an auto body shop in Connecticut. The customer called to inquire why he had not received an item he had ordered. Acres informed the customer that he did not see the order on the computer, but that he would be glad to send the customer the item. The customer responded, "You have already put it on my credit card." Acres suggested that the customer examine his credit card statement, and the customer stated that

11

the charge was listed under "Toolmart." When Acres told him, "we're not Toolmart," the customer's reaction was incredulous, "I always order from you . . . How could I have not ordered from you?"

Based on the evidence in the record as to actual customer confusion and similarity of the trade dress of the two catalogs, the jury's finding of likelihood of confusion was amply supported. We note that much less pervasive evidence of actual confusion than this has been held sufficient to allow a reasonable jury to infer that there was a likelihood of confusion. Harland, 711 F.2d at 978-79. (Plaintiff presented evidence as to only two instances of actual confusion. The court found that "the jury reasonably could have inferred" likelihood of confusion, "although the evidence . . . was not sufficient to compel" such a finding. (emphasis added)).

Furthermore, there was also support in the record as to the other factors that may be considered in making this determination. The district court instructed the jury that it could consider seven factors in assessing likelihood of confusion, although all seven were not necessary to support such a finding. Those factors adapted from Pizzeria Uno, 747 F.2d at 1527, are:

> (1) the strength or distinctiveness of the plaintiff's trade dress;
>
> (2) the similarity between the trade dress of the parties' product[s];
>
> (3) the similarity of [the] goods which the trade dress identified;
>
> (4) the similarity of [the] retail facilities and trade channels used to market the two lines of products;
>
> (5) the similarity in advertising used by the sellers of each line of product;
>
> (6) the defendant's intent; and
>
> (7) customer reaction indicating actual confusion.

12

While none of the other factors weighs as heavily in Tools USA's favor as do actual customer confusion and similarity of trade dress, there was evidence in the record as to each of the seven factors that supports the jury's finding of likelihood of confusion. For example, the Tools USA catalog's trade dress is relatively strong by virtue of the fact that for three years it was the only catalog of its type directed towards its particular market niche. As is evident from a visual comparison of the two catalogs, although they are certainly not identical, their trade dress is similar in many respects. The trade dress of each catalog identifies an identical product, namely, a catalog of tools and equipment (the goods sold in each catalog are also very similar). The parties utilize the same retail facilities, trade channels, and advertising, namely, direct mailing of catalogs to auto body shops.

As to Champ's intent, although the jury found that Champ did not intentionally copy Tools USA's trade dress, uncontroverted evidence indicated that Champ intentionally copied certain elements of Tools USA's trade dress. For example, Champ's president testified that some parts of the Toolmart catalog, such as the placement of the credit card box and the use of an American flag to designate American-made products, were used because they appeared in Tools USA's catalog, and he "wanted to do the same thing." Additionally, while working on the design for the Toolmart catalog, Champ's graphic designer was provided with a copy of a Tools USA catalog. Lastly, as discussed above, ample evidence of customer reactions indicated actual confusion.

* * * * * *

By special interrogatories, the jury found that the Tools USA catalog's trade dress was non-functional, that it had acquired secondary meaning, and that there was a likelihood of confusion between the Tools USA and Toolmart catalogs. Viewing the evidence in the light most favorable to Tools USA, and drawing every reasonable inference in its favor, we must conclude that a reasonable jury could have so found. Thus, the district court did not err in denying Champ's motions for judgment as to liability.

IV.

Finally, Champ argues that the jury's finding that Tools USA suffered $38,387.19 in damages "bears no rational relationship to the

13

supporting evidence." Brief of Appellant at 36. This argument is meritless.

The Lanham Act entitles a prevailing plaintiff, subject to equitable principles, to damages including: 1) defendant's profits, 2) plaintiff's damages, and 3) the costs of the action. 15 U.S.C.§ 1117(a). Tools USA sought attorneys fees and disgorgement of Champ's profits, but the district court found equity did not warrant recovery of these items; Tools USA does not appeal that ruling. The court refused to upset the jury's verdict as to Tools USA's actual damages; Champ claims this ruling was error.

With regard to its actual damages, Tools USA's president, Clyde White, testified that in order to protect its interests in the market from the effects of Champ's (unfair) competition, Tools USA distributed two more issues of its catalog than it ordinarily would have. He submitted two exhibits -- each reflecting the printing, mailing, and postage costs attendant to the design and distribution of the additional issues. Each exhibit includes a calculation of the value of White's time in designing the issue. The damages sought for one issue were $49,478.69, including $7,425.00 for White's design services; the damages attributable to the other extra issue were $45,812.19, again including $7,425.00 for White's design services. Champ did not assert that Tools USA did not send out the extra mailings; rather it maintained that the extra mailings were prompted by Tools USA's growing business, as opposed to Champ's unfair competition.

The jury obviously carefully considered the testimony and found some truth in both positions. Its award, $38,387.19, **5** is equal to the amount of the costs attributable to one of the catalogs -- the less costly one, $45,812.19 -- less the amount attributable to White's time, $7,425.00. There is certainly evidence to support this award. Indeed, contrary to Champ's suggestion that the jury' award was arbitrary, it is clear that the jury thoughtfully considered the arguments

_____

**5** As noted within, the parties stipulated that the award would be trebled pursuant to the state law claims. Thus, the district court trebled the $38,387.19 and entered judgment against Champ in the amount of $115,161.57. Champ does not maintain that the court erred in trebling the damages.

14

and evidence on both sides in making its determination of the proper measure of damages.

V.

The judgment of the district court is in all respects

AFFIRMED.

15