**ABC INDUSTRIES, INC., Plaintiff,**

v.

**KASON INDUSTRIES, INC., and Kason Merchandising Fixtures, Inc., Defendants.**

**No. CV 95–3522 RJD.**

United States District Court, E.D. New York.

Dec. 9, 1998.

Bernard Malina, Malina & Wolson, New York, NY, for the Plaintiff.

Dorian B. Kennedy, Kennedy, Davis & Kennedy, Atlanta, GA, Loretta Gastwirth, Meltzer, Lippe, Goldstein, Wolf and Schlissel, P.C., Mineola, NY, for the Defendants.

## MEMORANDUM & ORDER

DEARIE, District Judge.

ABC Industries, Inc. ("ABC") manufactured clothing display racks at the request of ABC's customer VF Factory Outlet ("VF"). ABC seeks declaratory judgment that its display rack: 1) does not infringe a patent owned by defendants Kason Industries, Inc. and Kason Merchandising Fixtures, Inc. (collectively "Kason"), and 2) does not violate Kason's trade dress rights. In addition, ABC has asserted a claim for tortious interference with business relations. Kason counterclaims, asserting: 1) patent infringement; 2) false designation of origin in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); 3) common law trademark violations and unfair competition; and 4) violation of New York's Anti–Dilution Statute. ABC has moved for summary judgment on its claims for declaratory judgment and on Kason's counterclaim. The motion is granted.

### Background

#### A. The '898 Patent

At issue in this case is Claim One of Kason's Patent Number 5,170,898 (" '898"), which describes a vertical support structure and a bracket assembly.[1] Claim One reads, in pertinent part:

1. Patent '898 is comprised of six claims. However, Claim One is the only important claim for the purpose of an infringement analysis, since Claims Two through Six incorporate or are "dependant" on Claim One as follows:

   Claim Two reads:

   2. The fixture system of claim 1 wherein at least some of the side walls of said external channel members have recesses therein....
   Claim Three reads:
   3. The fixture system of claim 1 further comprising an aperture in said bracket plate and an adjustment nut seated in an opening....

What is claimed is:

1. A fixture system comprising:

a support structure comprising a pair of internal channel members, each of said channel members comprising a central wall and two side walls integral therewith and extending substantially parallel to each other from opposite ends of said central wall, and a pair of external channel members, each of said external members comprising a central wall and two side walls integral therewith and extending substantially parallel to each other from opposite ends of said central wall, said structure being configured such that said central walls of said pair of internal channel members are spaced apart and substantially parallel to each other and said two side walls of one of said internal channel members extend in substantially opposite directions from said two side walls of the other of said internal channel members, and said central walls of said pair of external channel members are spaced apart and substantially parallel to each other, and substantially perpendicular to said central walls of said internal channel members, to the respective ends of which they are joined, and said two side walls of said external channel member extend substantially toward said two side walls of the other said external channel member, said support structure being configured such that each of said external channel members has its central wall extending past the respective ends of the side wall of said pair of internal channel members and the side walls of said outer channel members each extend past an end of a side wall of a respective inner channel member. . . .

This configuration of "channel members" forms two vertical grooves. The Claim goes on to describe:

Claim Four reads:
4. The fixture system of claim 1 further comprising a plurality of protrusions extending outwardly from said center wall of said internal channel members. . . .
Claim Five reads
5. The fixture system of claim 1 further comprising an elastomeric pad attached to a

a locking bracket assembly mountable in [the] first or second groove of said support structure, said locking bracket assembly comprising an adjustment plate, a bracket plate spaced apart from and substantially parallel to said adjustment plate, means connectable to said adjustment plate and said bracket plate for varying the distance therebetween such that said adjustment plate is brought into contact with a center wall of an inner face of an internal channel member in one of said grooves, and said bracket plate is brought into abutment with respective inner faces of side walls of said external channel members opposite said center wall, and a bracket arm integral with said bracket plate and extending outwardly from said bracket plate.

### a. Support Structure

The Abstract of '898 describes Kason's clothing display rack as having "[a]t least one vertical support member . . . formed with what may look to some like an I-beam type configuration. . . ." Column One of the patent description is entitled "I–Beam Fixture System." The specifications indicate that the "[i]nternal and external channels are joined together by means of either spot welding or another type of welding, or by means of double sided adhesive tape . . . ." *See* Fig. 1.

### b. Bracket Assembly

According to the specifications, the bracket assembly, "comprises [an] adjustment plate . . . [with] a threaded stud . . . moveable toward and away from [the] bracket plate by means of rotation of [an] adjustment nut . . . located with its central threaded opening . . . disposed within [an] opening in [the] bracket arm." When the adjustment plate and the bracket plate are brought together, the assembly can be slid into one of the grooves in the support structure. If the adjustment nut is then turned, it "causes [the] adjustment

rearward surface of said adjustment plate . . .
Claim Six is, in turn, dependant on Claim Five and thus also incorporates Claim One.
6. The fixture system of Claim 5 wherein said elastomeric pad comprises a plurality of ribs.

plate to move away from [the] bracket plate until the . . . rearward surfaces of [the] adjustment plate come into contact with the [rear wall of the groove] . . . . Further finger tightening of [the] adjustment nut . . . causes binding or locking of the plates . . . with the result that [the] arm is securely and reliably positioned." *See* Fig. 1.

### 1. *Patent History*

In the 1980's, David Katz, Gerald Fremderman and Paul Ioss designed a new clothing display fixture, and assigned the patent rights to Kason. A first application for a patent on December 4, 1987, claimed:

1. A fixture system, comprising, in combination:

at least one support member formed with an elongated first bearing surface disposed between opposing walls integral therewith,

said support member further including a second and third bearing surfaces spaced from one another and, respectively, being spaced from said first bearing surface, said second and third bearing surfaces each being integral with one of said opposing walls,

said first and second bearing surfaces, together with one of said opposing walls defining a first groove, said first and third bearing surfaces with the other of said opposing walls defining a second groove,

a locking bracket assembly cooperative with said support member, said locking bracket assembly including lateral portions thereof formed with a pair of spaced first and second front bearing portions, said locking bracket assembly being further formed with a third rear bearing portion spaced from said first and second front bearing portions, said lateral portions being operatively moveably disposed within said first and second grooves, and

locking means for moving said third rear bearing portion relative to said first and second front bearing portions, thereby substantially fixing the position of said locking bracket with respect to said support member.

This application was rejected under 35 U.S.C. § 102(b) as "clearly anticipated by Boegehold and Barrett." In addition, four other patents "show similar devices." The Barrett Patent Number 3,848,844, titled "Adjustable Display Shelf Apparatus," claims a support structure with elongated grooves and a support bracket that can be adjusted to different heights by means of a latch pin. The Boegehold Patent Number 3,811,575, titled, "System of Constructing Display Racking and Shelving," claims a support structure "wherein two elongated members each define a track therein" and a support bracket that can be adjusted to different heights by means of two plates that can be moved apart to create tension.

When Kason resubmitted their claim on December 9, 1989, it was again rejected as anticipated by the Boegehold and Barrett patents.

On September 10, 1991, Kason submitted an application amending the claim, canceling its prior "first claim" and adding new claims 2–7.[2] In the "Remarks" section, Kason asserted that "the new independent claim 2 is patentable over the Boegehold and Barrett references" because it described a unique support structure and bracket.

According to Kason, the support structure was unique because neither the Boegehold or Barrett patents "shows or suggests the detailed support structure stated in the new claim 2, particularly with reference to the forming of the two grooves, with each of the grooves being defined by a combination of the inwardly facing surfaces of the central wall and side walls of one of the internal channel members, the inwardly facing surfaces of a respective side wall of each of the external channel members, and a portion of the inwardly facing surface of each center wall of each external channel member, this portion being adjacent to a side wall of the external channel member."

The bracket assembly was claimed to be unique because the Boegehold and Barrett patents lacked a locking bracket assembly

---

**2.** These claims became Claims One through Six in the '898 patent.

where "the adjustment plate and the bracket plate [are] spaced apart from and substantially parallel to the adjustment plate, and means connectable to the two plates for varying the distance between them. . . ."

Claims 2–7 were accepted, and on December 15, 1992, Kason was granted patent number 5,170,898. Despite this hard won patent, Kason never marked its fixtures or packaging with the patent number or similar notation.

### 2. *Appearance of Kason Fixtures*

Kason sells a range of clothing display fixtures. In some, the upright posts have an I-beam shape, as seen in Patent '898. ('898 Fixtures). However, Kason also sells fixtures with tubular shaped posts. (Kason Fixtures) All posts have vertical grooves or slots. Flat backing plates are visible through the slots. The colors of the tubes and backing plates either match or contrast. Over an eight year period, Kason sold several hundred thousand fixtures to approximately one hundred major retail chains, generating over $15 million in sales. Kason has spent approximately $400,000 promoting these fixtures. David Katz, the president of Kason, testified that "many fixture buyers have indicated to me that they recognize the Kason Fixtures as originating from Kason based on their appearance." He also testified that Kason's fixtures had been the subject of unsolicited media coverage.

### 3. *Method of Sale*

During his deposition, David Katz explained that when a retail store or chain needs new display racks for a department, it contacts a display rack vendor with whom the retail store has a relationship, explains its specific needs and sends the vendor floor plans. The vendor prepares a presentation, suggesting color, style, and organization. At some point the vendor and the retail store negotiate price, at which time the retail store will often contact other vendors in search of a better price.

### B. *ABC's Fixture*

In 1993, VF Factory Outlet purchased fixtures from Kason for use in its stores. A year later, VF, dissatisfied with Kason's pricing, quality and delivery, commissioned display racks from ABC. Before placing an order with ABC, VF asked ABC whether production of the display racks would infringe any third party patent rights. In a letter dated March 18, 1994, ABC's attorney assured VF that they had found no patent that related to the Kason fixture system, and promised to indemnify VF against any infringement action.

ABC's display rack ("ABC Fixture") has an extruded or molded, tubular support structure with four elongated grooves at the points of the compass. *See* Fig. 2. A bird's eye view shows a circle encompassing a square structure. The grooves interrupt the circle at the four points of the compass. The ABC bracket assembly is comprised of a bracket plate comprised of two wedge shapes, the upper wedge being fixed, and the lower moveable, so that when the wedges are separate, the assembly can slide into a groove. *See* Fig. 3. To lock the arm, the bottom of the lower wedge must rest on a protrusion on the back wall of the groove, and the upper wedge must be pulled down over the lower wedge, forming a whole which locks in place. There is no dispute that ABC's Fixtures closely resemble Kason's tubular post fixtures.

VF purchased approximately 300,000 fixtures from ABC. VF was the sole purchaser of the accused fixture. ABC's president, Lloyd Kielson, testified that ABC did not sell the accused fixtures to anyone after July 1995.

### C. *Northern District of Georgia Action*

In February of 1995, VF's general counsel, Candace Cummings, was contacted by Kason and told that fixtures purchased by VF infringed a Kason patent. However, when she requested the number of the patent infringed, she received no answer.

In July of 1995, ABC learned that Kason had filed suit against VF in the Northern District of Georgia alleging infringement of the '898 Patent, false designation of origin

and deceptive trade practices. As a result, VF refused to purchase the ABC Fixtures.[3]

On July 31, 1995, ABC's counsel informed Kason's counsel that ABC had manufactured the accused fixtures and offered a settlement proposal for the Georgia Action under which ABC would be permitted to sell off its existing inventory of fixtures. On August 8, 1995, Kason's counsel telephoned ABC's counsel, rejected the proposal, threatened legal action if ABC did not stop selling the ABC fixtures, and demanded that ABC pay Kason a certain sum of money. ABC rejected Kason's demands.

On August 25, 1995, ABC filed this action. On October 18, 1995, Kason filed their answer and counterclaims.

### Discussion

#### A. Summary Judgment Standard

A motion for summary judgment should be granted only where "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). In evaluating these motions, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

At the same time, however, the existence of a factual dispute alone is insufficient to defeat a motion for summary judgment; the non-moving party must offer affirmative evidence tending to support its position. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment may be entered against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 321, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

#### B. Patent Infringement

ABC moves for summary judgment on the grounds that the ABC fixture does not infringe the '898 patent literally because: 1) ABC's support structure does not contain external or internal channels; and 2) ABC's bracket plate is not "spaced apart" from the adjustment plate, rather the two wedge shaped plates are in constant contact.

ABC also moves for summary judgment on the grounds that the ABC fixture does not infringe under the doctrine of equivalents.

#### 1. Literal Infringement

Kason argues that Patent '898 is literally infringed because ABC's vertical support contains both internal and external "channels" within its structure. Under Kason's interpretation, a "channel" is a u-like shape that may be extrapolated from a unitary structure. More specifically, Kason claims that the east and west walls of the internal square are "internal channels," and that the north and south sections of the circle are "external channels." *See* Fig. 4.

Kason contends that ABC's bracket assembly literally infringes Patent '898 because the wedges of ABC's assembly are "substantially parallel" and "spaced apart" and have a "means connectable ...for varying the distance therebetween."

Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device, i.e. when the properly construed claim reads on the accused device exactly. *Wright Medical Technology, Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1443 (Fed.Cir.1997); *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1580 (Fed.Cir.1989) (citing cases).

An infringement analysis entails two steps. First, the claim must be construed by the court to determine its scope and meaning. Second, the claim as construed must be compared to the accused device. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *Ethicon Endo–Surgery, Inc. v. United States*

---

**3.** This action has since settled.

*Surgical Corp.*, 149 F.3d 1309, 1315 (Fed.Cir. 1998).

### a. *Meaning and Scope*

■ It is well established that, in interpreting the claims, the court should look to three sources: the claims themselves, the patent specifications and the prosecution history. *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed.Cir.1991). In construing a claim, unless the specification or file history indicates that the inventor intended otherwise, a claim term will be accorded its ordinary and accustomed meaning. *Carroll Touch, Inc. v. Electro Mechanical Systems, Inc.*, 15 F.3d 1573, 1576 (Fed.Cir.1993).

### i. *"Channels"* [4]

■ Kason's view that a "channel" is any u-like shape that can be drawn from a solid structure is contradicted by the ordinary meaning of the word "channel," the description of a channel in Claim One, the patent specifications and its prosecution history.

According to The Random House College Dictionary, a "channel" is "any structure member having the form of three sides of a rectangle." According to Webster's Third International Dictionary, a channel is "a metal beam or strip having a u-shaped section." The ordinary meaning is thus a distinct structural member or a metal beam in a u-shape.

The language of the claim does not assign any other meaning to the term "channel," rather, it too indicates that a channel is a distinct u-shaped piece, as it describes a "pair of internal channels" and a "pair of external channels." The patent specifications also indicate channels as individual elements that must be "joined together by means either of spot welding … or … double sided tape … or adhesive…."

Finally, we know from the "Remarks" accompanying Kason's successful patent application, that what was uniquely patentable about the Katz design was the structural configuration of the four "channels."

Following *Markman*, this Court concludes that the term "channel" means an individual u-shaped bar or structural element, not simply any u-shape that can be imagined to exist within a unitary structure.

### 2. *Comparison*

■ The second step in an infringement analysis is determining whether a particular device infringes a properly construed claim, which is a question of fact. *See Markman*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *Carroll Touch*, 15 F.3d at 1576. As noted earlier, literal infringement exists only if each of the limitations of the asserted claims "reads on," or is found in, the accused device. Although such a comparison is essentially a factual determination, it is amenable to summary judgment, where, as here, no reasonable fact finder could find literal infringement. *Ethicon*, 149 F.3d at 1315.

■ There is no dispute that ABC's support structure is a unitary extruded column. Kason cannot show that this column is made of four independent u-shaped bars.

■ As concerns the bracket assembly, the fixed wedge is comparable to the "bracket plate" and the moveable wedge comparable to the "adjustment plate." In addition, the wedges, or at least their facing planes, are arguably substantially parallel to each other. However, the distance between the two wedges in ABC's bracket assembly, never varies, as is required in Claim One, rather the wedges are in constant contact. Thus, another limitation of the '898 Patent cannot be met, that the "adjustment" wedge and the "bracket" wedge be "spaced apart." [5]

---

4. There is no debate on the meaning of the terms employed in the description of the bracket assembly.

5. The holding of non-infringement of Claim One applies as well to all claims dependent on Claim One. *See Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed.Cir.1994). "One who does not infringe an independent claim cannot infringe a dependent claim on (and thus containing all the limitations of) that claim." *Becton Dickinson and Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 798 (Fed.Cir.1990) *quoting Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed.Cir.1989) Claims 2,3,4 and 5 are dependent on Claim One. Claim Six is dependent on Claim Five, and thus by the transitive property is dependent on Claim One.

No reasonable fact finder could conclude that ABC's fixture literally infringes the '898 Patent when there is no evidence that ABC's fixture contains three specific limitations of Claim One: 1) that the support structure be formed of four individual u-shaped bars; 2) that the plates of the bracket assembly be spaced apart; and 3) that the distance between them be variable.

### 3. Doctrine of Equivalents

■ "The doctrine of equivalents prevents a copyist from evading patent claims with insubstantial changes." *Valmont Industries Inc. v. Reinke Mfg. Co., Inc.*, 983 F.2d 1039, 1043 (Fed.Cir.1993). In *Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 117 S.Ct. 1040, 1049, 137 L.Ed.2d 146 (1997), the Supreme Court held that the doctrine is to be applied to "each element contained in the patent claim ... not to the invention as a whole." Thus, for there to be infringement under the doctrine of equivalents, "every limitation of the asserted claim, or its 'equivalent' [must be present] in the accused device." *Ethicon*, 149 F.3d at 1315.

■ A claim element is equivalently present in an accused device if only "insubstantial differences" distinguish the element from the corresponding aspects of the patented device. *Warner–Jenkinson*, 117 S.Ct. at 1046, 1047, citing *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950) ("One who seeks to pirate an invention ... may be expected to introduce minor variations to conceal and shelter the piracy.").

Another commonly used test for determining equivalence is the tri-partite identity test: an accused device which performs "the same work, in substantially the same way, [to] accomplish substantially the same result" as the claimed invention is an equivalent. *Graver Tank*, 339 U.S. at 608, 70 S.Ct. 854. The Supreme Court has more recently observed that this test is suitable for analyzing mechanical devices, but provides a poor framework for analyzing product configuration claims. *Warner–Jenkinson*, 117 S.Ct. at 1054.

■ Although equivalence is a factual matter normally reserved for the fact finder, summary judgment is appropriate when no reasonable fact finder could find equivalence. *Warner–Jenkinson Co.*, 117 S.Ct. at 1053 n. 8.

#### a. Support Structure

■ "[W]hat constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case." *Graver Tank*, 339 U.S. at 609, 70 S.Ct. 854 (1950); *Ethicon*, 149 F.3d at 1316 (to determine whether there was infringement under the doctrine of equivalence, the court applied the "All Elements" rule, and the doctrine of prosecution history estoppel).

Recent case law reflects the inherent tension between the role of the doctrine in preventing "fraud on a patent" and the primacy of the claims in defining the scope of a patentee's exclusive rights. *Compare Warner–Jenkinson*, 117 S.Ct. at 1049 ("The doctrine of equivalents, when applied broadly, conflicts with the definitional and public notice functions of the statutory claiming requirement"); *and Sage Products, Inc. v. Devon Industries, Inc.*, 126 F.3d 1420, 1424 (Fed.Cir.1997) ("[If] a patentee ... has claimed an invention narrowly, there may not be infringement under the doctrine of equivalents in many cases, even though the patentee might have been able to claim more broadly. If it were otherwise, then claims would be reduced to functional abstracts, devoid of meaningful structural limitations on which the public could rely."); *with Ethicon*, 149 F.3d at 1317 (warning that if the doctrine of equivalents is applied too narrowly, "the doctrine [will be reduced] to nothing more than a repeated analysis of literal infringement.")

■ With these admonitions in mind, we review Kason's claim of equivalency. Kason argues that equivalency exists because the separate claim limitations of '898 (or the channels) have simply been combined into a single component in ABC's support structure.

Kason cites *Dolly, Inc. v. Spalding and Evenflo Companies, Inc.,* 16 F.3d 394, 399 (Fed.Cir.1994) for the proposition that "equivalency can exist when separate claims are combined into a single component of the accused device." However, in *Dolly,* the court found that there was no equivalency between a patent which described a child's chair comprised of a rigid frame *and* back and seat panels and the accused child's seat where the back and seat themselves created a rigid structure. The court held that "the concept of equivalency cannot embrace a structure that is specifically excluded from the scope of the claims." *Id.* at 400.

In this case, both the language and the prosecution history of Claim One specifically exclude a unitary extruded structure. As we have stated above, the language of Claim One indicates "a pair" of internal channels and "a pair" of external channels, which we found meant that four individual pieces make up the support structure.

Given the patent history, Kason is barred from contending that the '898 patent encompasses a unitary support structure. Indeed, the Barrett patent indicates a unitary structure, very similar to ABC's fixture. In Kason's effort to distinguish its patent application, it claimed that it was the *"detailed* support structure stated in new claim 2, particularly with reference to the forming of the two grooves, with each of the grooves being defined by a combination . . . [of the internal channels and the external channels]" that made its claim patentable over prior art.

We do not believe we are reading the doctrine of equivalence too narrowly when we hold, in light of our previous construction of '898's limitation of four "channels" and its prosecution history, that no reasonable fact finder could conclude that a support structure that is a single piece of material is the equivalent of a support structure that is comprised of four "channels" or u-shaped bars.

b. *Bracket Assembly*

■ Kason contends that ABC's bracket assembly is equivalent because it performs the same function (support of the bracket arm) in the same manner (by expanding to fill the groove) to achieve the same result (adjustment of the arm to different heights).

However, Claim One indicates that Kason's parallel bracket plates expand to fill the groove by "means connectable to [the] adjustment plate and [the] bracket plate for varying the distance therebetween." ABC's bracket assembly does not have a "means connectable" or a bolt, to move the plates apart, rather, ABC's bracket assembly expands when the two wedge shapes are moved together. No reasonable juror could find that ABC's bracket functions in the same way as the bracket assembly of patent '898.

ABC is granted summary judgment on its claim of non-infringement.

4. *Damages*

■ Even if Kason could show infringement, it would not be entitled to damages because there is no evidence that ABC continued to sell the ABC Fixtures after receiving notice of infringement. Kason argues that ABC had notice of its infringement as early as February 1995, and continued to sell its fixtures through September of 1995.

35 U.S.C. § 287(a) reads:

Patentees, and persons making or selling any patented article for or under them, may give notice to the public that the same is patented . . . by fixing thereon the word "patent" . . . or the abbreviation "pat," together with the number of the patent . . . or by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except upon proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

There is no dispute that Kason failed to mark the Kason Fixtures with the '898 patent.

a. *Notification*

■ Section 287(a) provides that absent marking, a patentee cannot recover damages

without proof that "the infringer was notified of the infringement." Although Kason argues that ABC had constructive notice in February 1995, when Candace Cummings was told that VF was infringing some patent of Kason, section 287(a) required that the accused infringer must have actual notice. Actual notice requires the affirmative communication of a specific charge of infringement by a specific accused product or device. *Amsted Industries Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed.Cir.1994). *See also Dunlap v. Schofield*, 152 U.S. 244, 247–248, 14 S.Ct. 576, 38 L.Ed. 426 (1894) (construing a predecessor statute to section 287, the Court noted that the "clear meaning" of the notification requirement is that a patentee cannot recover damages absent marking or notice to the "particular defendants by informing them of his patent and of their infringement of it.")

There is evidence of only two occasions when Kason spoke directly to ABC. During the conversation in August, 1995, there is no evidence that Kason's counsel told ABC that ABC was infringing the '898 patent. Thus ABC did not have statutorily effective notice until October 1995, when Kason filed its counterclaims.

#### b. *Continued Infringement*

Finally, after full discovery, Kason has failed to come forward with any evidence that ABC sold the fixtures after October 1995. Kason has submitted an ABC order form, prepared in December of 1994, which shows VF Factory Outlet as the client, and shipping dates as late as 08/01/95. On the last page of these forms under Warehouse Instructions is the direction "3 Stores September Delivery!" There is no indication of any sales or shipments after September.

#### C. *Trade Dress Infringement*

Kason has tendered evidence that the design of the Kason Fixture is sufficiently identified with Kason to be protected under the Lanham Act. Kason maintains that ABC's Fixtures are nearly identical to Kason's Fixtures in appearance. However, this claim must fail because there is no evidence that any purchaser was actually confused by the similarity of the designs, or would likely be confused.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) provides a cause of action against:

> [a]ny person who, on or in connection with any goods or services... uses in commerce any word, term, name, symbol, or device ... or any false designation of origin ... which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship or approval of his or her goods, services or commercial activities ....

To succeed on claims of trade dress infringement, an owner of the dress must show: 1) that its trade dress is entitled to protection under the Lanham Act, and 2) that the offending product's design infringes on the owner's dress by creating a likelihood of confusion. *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373 (2d Cir. 1997).

#### 1. *Protectable*

The "trade dress" of a product includes the "design and appearance of a product as well as that of the container and all elements making up the total visual image by which the product is presented to customers." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir.1995). *See also LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 75 (2d Cir.1985) *quoting John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir.1983). The trade dress of a product is protected under § 43(a) if: 1) the design is inherently distinctive, or 2) has acquired a secondary meaning in the marketplace by which it is identified with its producer or source. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768–769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

#### a. *Secondary Meaning*

The design of a product has "secondary meaning" when the purchasing public associates that dress with a single producer or source rather than just with the product itself. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n. 11,

102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). Factors the court should consider in determining the existence of secondary meaning are: i) plaintiff's advertising expenditures; (ii) consumer surveys linking the trade dress to a particular source; (iii) sales success; (iv) unsolicited media coverage; (v) attempts to copy the trade dress; and (vi) the length and exclusivity of the use. *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1536 (2d Cir.1992).

Kason presents some evidence that its fixture has acquired secondary meaning because: 1) Kason has spent approximately $400,000 in advertising; 2) buyers have told Katz that they recognize the Kason Fixtures as originating from Kason by their appearance; 3) several hundred thousand Kason Fixtures have sold for a total of $15 million; 4) Kason Fixtures have appeared in unsolicited articles; and 5) Kason was the exclusive producer of the Fixtures for 8 years.

■ ABC argues that Kason cannot claim trade dress protection of its display rack, because the design of the rack, a vertical support with an arm, is legally "functional." A "design is legally functional, and unprotectable, if it is one of a limited number of ... options available to competitors and free competition would be unduly hindered" if the design was protected. *Two Pesos*, 505 U.S. at 775, 112 S.Ct. 2753. Kason does not claim trade dress in a vertical support with an arm, however, but in the tubular appearance of the support and the contrasting interior plates of the grooves. These aesthetic design elements are not functional.

## 2. Likelihood of Confusion

■ Although Kason's trade dress may be protectable, Kason has failed to show that there is a likelihood of confusion between the ABC Fixture and the Kason Fixture. To measure the likelihood of confusion, we weigh the familiar *Polaroid* factors: 1) the strength of the plaintiff's mark or dress; 2) the similarity between the two marks or dresses; 3) the proximity of the products in the marketplace; 4) the likelihood that the accused dress will bridge the gap between products; 5) evidence of actual confusion; 6) the defendant's bad faith; 7) the quality of the defendant's product; and 8) the sophistication of the relevant consumer group. *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.1961); *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 376 (2d Cir.1997). The eight-factor list is not exclusive, and "the evaluation of the *Polaroid* factors is "not a mechanical process ... [r]ather a court should focus on whether consumers are likely to be confused." *Paddington Corp. v. Attiki Importers & Distributors*, 996 F.2d 577, 584 (2d Cir.1993).

■ 1) *Strength of the Mark:* A trade dress' strength refers to its distinctiveness, its ability to identify the goods as coming from a particular source. *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 1998 WL 751699 (2d Cir.(1998)) The fixture buyers' statements to Katz are evidence of the strength of Kason's mark.

2) *Degree of Similarity:* From the photographs and diagrams submitted it is apparent that the ABC and Kason Fixture are very similar in appearance. Both are modular, tube shaped display fixture systems with adjustable arms.

3) *Proximity of Products:* As both Fixtures are clothing display racks, they would compete in the same market.

4) *Bridging the Gap:* As seen above, ABC and Kason already occupy the same market. Thus, the question of whether ABC would enter Kason's market, or "bridge the gap" is not relevant.

5) *Evidence of Actual Confusion:* It is undisputed between the parties that the only purchaser of ABC's fixtures to date has been VF, who was not only aware that ABC's fixture were not those of Kason, but specifically had ABC design the fixtures to resemble those of Kason. There is therefore, no evidence of actual confusion.

6) *Junior User's Bad Faith:* There is no evidence that ABC was acting with intent to confuse consumers as to the source of their fixtures. Rather the facts suggest that ABC was responding to VF Factory's request to produce the fixtures.

7) *Quality of the Product:* This factor is neutral, as Kason has not asserted that ABC's fixtures are of a poorer quality.

8) *Sophistication of the Consumers:* Kason does not maintain that the consumers of the fixtures are unsophisticated. Rather, as Katz admitted in his deposition, purchasers of retail clothing display racks negotiate among vendors and do extensive research as to price and design.

There is evidence in the record that Kason's mark is strong, that ABC Fixtures resemble and compete with Kason's Fixtures. However, there is no evidence that ABC intended to confuse consumers, that ABC's fixtures are of a lesser quality, or that sophisticated buyers would be confused by the appearance of ABC's fixture as to their origin or source. *See Streetwise,* 159 F.3d 739, 1998 WL 751699. (upholding district court's finding of lack of trade dress infringement when factors #5 (actual confusion); #6 (good faith); and #8 (sophistication of the purchasers) weighed in defendant's favor).

"To support a finding of infringement, a probability of confusion, not a mere possibility must exist." *Streetwise Maps,* 159 F.3d 739, 1998 WL 751699 at *3. A probability of confusion may be found when a large number of purchasers likely will be confused as to the source of the product. *Id.* There is no evidence of actual or probable confusion in the record. For this reason, we grant ABC's motion for summary judgment on trade dress infringement.

## CONCLUSION

ABC's motion for summary judgment is granted. Kason's counterclaims are dismissed. The Court declines to exercise jurisdiction over the remaining state law claims. The Clerk of the Court is directed to close this case.

SO ORDERED.