## LANDSCAPE FORMS, INC., Plaintiff,

v.

## COLUMBIA CASCADE COMPANY, Defendant.

### No. 94 Civ.8122(JES).

United States District Court, S.D. New York.

Oct. 6, 2000.

---

Heslin & Rothenberg, P.C., Albany, NY, Susan E. Farley, Jeffrey R. Klembczyk, of counsel, for plaintiff.

Ahmuty, Demers, & McManus, Albertson, NY, Frederick B. Simpson, of counsel, John M. Berman, Tigard, OR, for defendant.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, Senior District Judge.

In this action for trade dress infringement, unfair competition, and dilution of trade dress, plaintiff Landscape Forms, Inc. ("Landscape") seeks a judgment permanently enjoining defendant Columbia Cascade Company ("Columbia") from selling or advertising its Colonnade line of benches and litter receptacles. Landscape also seeks an award of damages in the amount of $2,066,025 plus attorney's fees and dismissal of Columbia's counterclaim alleging unfair competition based on mali-

cious prosecution and requesting a declaratory judgment of non-infringement. For the reasons set forth below, the Court denies Landscape's claims seeking a permanent injunction and monetary damages, dismisses Columbia's counterclaims for malicious prosecution and grants Columbia's request for a declaratory judgment of non-infringement.

## BACKGROUND

Landscape and Columbia manufacture and sell site furnishings to large commercial and municipal entities in the United States. In the fall of 1989, Landscape introduced the Petoskey Collection ("Petoskey" or "the Petoskey line") of modern outdoor furniture. *See* Plaintiff's Post–Trial Brief dated June 26, 1998 ("Pl.PTB") at 1. The Petoskey Collection includes two different outdoor trash cans, two benches without back support, and six benches with backs. *See Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 375 (2d Cir.1997). The most notable pieces in the Collection are the benches made of three-inch metal tubing bent to form the legs and the support. The benches are shaped and curved to fit the human form and are supported by only two or three legs, giving them the appearance of being suspended in air. In early 1994, Columbia emulated the Petoskey design by introducing its own Colonnade line. *See Landscape Forms, Inc. v. Columbia Cascade Co.*, 70 F.3d 251, 252 (2d Cir.1995).

On November 9, 1994, Landscape filed suit alleging that Columbia's Colonnade line infringed the trade dress of its Petoskey Collection in violation of section 43(a) of the Lanham Act and New York State unfair competition and anti-dilution laws. On December 30, 1994, Landscape moved for a preliminary injunction. The Court held a hearing on January 17, 1995 and, at the close of testimony, issued a temporary restraining order prohibiting Columbia from selling or advertising its Colonnade furniture.

On February 14, 1995, the Court heard summations and issued an opinion from the bench finding that Landscape had demonstrated at least substantial questions on the merits of its Lanham Act claim, *i.e.*, that the trade dress of the Petoskey line was distinctive; that there was a likelihood of confusion between the Colonnade and Petoskey lines, *see Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.1961); and that the balance of hardships tipped decidedly in favor of Landscape. *See Landscape Forms*, 70 F.3d at 252–53. On March 3, 1995, the Court issued a preliminary injunction prohibiting Columbia from selling or advertising its Colonnade furniture in the United States.

Columbia appealed, and, on November 13, 1995, the Second Circuit vacated the preliminary injunction and remanded for the Court to consider the affirmative defense of functionality. *See Landscape Forms*, 70 F.3d at 253–55. Specifically, the Second Circuit instructed the Court to consider whether the Petoskey design " 'confers a significant [competitive] benefit' to Landmark [sic] 'that cannot practically be duplicated by the use of alternative [furniture] designs', ... thus making the design functional and not protectible trade dress." *Id.* at 254 (quotations and citations omitted).[1]

On January 2, 1996, pursuant to the remand, the Court held a hearing to weigh the evidence and make additional factual findings. At the hearing, Landscape called four witnesses: Arno Yurk, an industrial designer for Landscape; William Main, Landscape's president; S. Kenneth Kirn, Columbia's President; and Leonard

---

1. The same day that the Second Circuit remanded the instant action, it issued an opinion in *Knitwaves, Inc. v. Lollytogs, Ltd.*, 71 F.3d 996, 1009 (2d. Cir.1995), in which it reversed a district court's judgment in favor of plaintiff's Lanham Act claim, finding that plaintiff's "designs were not primarily intended as source identification" and therefore failed to qualify for protection as trade dress.

Hopper, the chief landscape architect for the New York City Housing Authority. *See* Hearing Transcript dated January 2 to 4, 1996 ("1996 Tr.") at 65–66, 140, 172–73, 212. Columbia called one witness, Joseph Fasanella, the vice president of Mid–Atlantic Products, a manufacturers' representative. *See* 1996 Tr. at 44. The Court also reviewed post-hearing briefs together with exhibits and excerpts of deposition testimony.

By Memorandum Opinion and Order dated October 16, 1996, the Court concluded that Columbia's defense of aesthetic functionality was factually unsupported and that Landscape's trade dress was entitled to Lanham Act protection. The Court made the following findings: first, there are a large number of furniture designs available that can be utilized to compete effectively with Landscape's Petoskey Collection in terms of price, quality, and aesthetic appeal. *See Landscape Forms v. Columbia Cascade Co.*, 940 F.Supp. 663, 665 (S.D.N.Y.1996), *vacated* 113 F.3d 373 (2d Cir.1997). Second, persuasive expert testimony established that several competitive designs already exist. *See id.* Third, Columbia failed to show that its overall business was adversely affected by the trade dress protection afforded to Landscape's site furnishings, and, in fact, the Colonnade line was a "small fraction" of Columbia's business. *See id.* at 666.

Columbia appealed the Court's rejection of the functionality defense, as well as the issues raised in its first appeal. On appeal, Columbia also argued that Landscape's designs do not qualify for trade dress protection because they are not " 'likely to serve primarily as source designators.' " *Landscape Forms*, 113 F.3d at 376. On May 16, 1997, without addressing Columbia's functionality defense, the Second Circuit again vacated the injunction, holding that Landscape has yet to show that its line of furniture is protectible under the Lanham Act. *See id.* at 377, 382.

The instant bench trial began before the Court on April 20, 1998 and proceeded for two days. In support of its cause of action and in opposition to Columbia's counterclaim, Landscape offers four contentions. First, Landscape argues that its Petoskey Collection has attained secondary meaning and is inherently distinctive. *See* Pl. PTB at 3–8, 16–21. Second, Landscape contends that a likelihood of confusion as to source, sponsorship, or affiliation exists between its Petoskey Collection and Columbia's Colonnade line. *See id.* at 8–12, 21–28. Third, Landscape asserts that Columbia should be found in violation of the New York State unfair competition and antidilution laws even if the Court does not find Columbia in violation of the Lanham Act. *See id.* at 29–31. Finally, Landscape argues that Cascade's counterclaim alleging unfair competition based on malicious prosecution is deficient because commencement of lawsuits is not actionable as unfair competition under state or federal law since Landscape is engaging in a good faith attempt to enforce its legal rights, and because Columbia's pleading is insufficient. *See id.* at 33–34.

In opposition, Columbia also offers four contentions to support its case. First, Columbia argues that Landscape does not have protectible trade dress because the design of its Petoskey Collection was not intended primarily as a source identifier and because Landscape's alleged trade dress is not conceptually separable from the product itself. *See* Defendant's Post–Trial Brief dated June 26, 1998 ("Def.PTB") at 1–5. Second, Columbia contends that its Colonnade furniture design is significantly different from that of the Petoskey Collection and, regardless, Landscape's designs are generic and its alleged trade dress descriptions overly broad. *See id.* Third, Columbia asserts that testimony given by Landscape's President at the hearing substantiates its aesthetic functionality defense.[2] *See id.* Final-

---

**2.** The Court declines to address the merits of Columbia's contentions regarding the aesth-

ly, Columbia argues that Landscape has not established the requisite likelihood of confusion as to source between the two company's furniture lines. *See id.* Accordingly, defendant seeks dismissal of plaintiff's claims, a declaratory judgment of non-infringement and further demands relief in its counterclaim for unfair competition based on plaintiff's alleged malicious prosecution of this action.

## DISCUSSION

### I. Lanham Act Claim

#### A. Secondary Meaning

■■■ Landscape may prove a violation of section 43(a) of the Lanham Act only if it first demonstrates that its Petoskey line of furniture has acquired secondary meaning. *See Wal–Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 120 S.Ct. 1339, 1344–46, 146 L.Ed.2d 182 (2000). Previous decisions of both this Court and the Second Circuit Court of Appeals ("Second Circuit") have proceeded under the now erroneous assumption that the Petoskey trade dress is entitled to protection if Landscape demonstrates either inherent distinctive-

ness or secondary meaning. *See Landscape Forms,* 113 F.3d at 377–82. In *Wal–Mart,* the Supreme Court declared that product-design trade dress is only protected under the Lanham Act where the requisite product distinctiveness is proven through a showing of secondary meaning. *See id.* at 1345–46. Product-packaging, on the other hand, may be protected where either inherent distinctiveness or secondary meaning has been proven. *See id.* at 1345; *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 774–76, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). The Second Circuit has made it clear that the case at bar involves "the design of a series of products, not their packaging." *Landscape Forms,* 113 F.3d at 379. Accordingly, Landscape must show that the product design of the Petoskey pieces [3] in question are distinctive and protectible because they have acquired secondary meaning.[4]

■■ There are six elements that the Court uses as a guide in assessing whether a product has acquired secondary meaning.[5] These elements are: (1) advertising

etic functionality defense in this opinion. Columbia has presented no evidence demonstrating the error of the Court's previous decision on this issue. Accordingly, the Court reaffirms its earlier holding and rejects Columbia's argument that Petoskey is purely aesthetically functional.

3. The Second Circuit noted the difficulties raised by Landscape's attempt to obtain trade dress protection for an entire line of products. *See Landscape Forms,* 113 F.3d at 380–81. Both this Court and the Second Circuit previously considered this issue in the context of determining whether the Petoskey line was inherently distinctive. Because inherent distinctiveness is no longer a concern in this case, this issue is largely moot. Similarly, to the extent that there is a question regarding which items of the Petoskey line have achieved secondary meaning, the Court's ultimate rejection of plaintiff's Lanham Act claim makes resolution of this question academic. Thus, the Court will not make distinctions between the ten different Petoskey products subject to plaintiff's claim in its discussion of secondary meaning.

4. Throughout this case, plaintiff has implored the Court to exercise its power of judicial estoppel and thereby preclude defendant from arguing that Colonnade does not infringe on the Petoskey trade dress because of allegedly inconsistent arguments defendant made in a prior litigation. *See e.g.,* Pl. PTB at 14–16. The Court chooses not to exercise this discretionary power, however, particularly because the prior litigation in question terminated by way of a consent judgment and because of the substantial factual disparities between that case and the case at bar. *See id.* Specifically, the prior litigation involved allegations of intentional palming off that are not present here. *See id.* at Exh. K.

5. The Second Circuit's statement that this Court had "concluded that Landscape had not demonstrated secondary meaning," *Landscape Forms,* 113 F.3d. at 382, is correct to the extent that this Court had not, at the time of that decision, reached any conclusion regarding the sufficiency of Landscape's showing on the issue of secondary meaning. This Court's remark that it did not have "enough of a record" to make a finding regarding

expenditures; (2) evidence that consumers link the trade dress to a particular source; (3) unsolicited media coverage of the product; (4) the sales success of the product; (5) attempts to plagiarize the product; and (6) the length and exclusivity of use of the product. *See Thompson Med. Co. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir.1985). None of these elements is determinative and not every one of them must be proved to make a showing of secondary meaning. *See id.* Hence, "existence of secondary meaning ... [is] not to be determined by application of a rigid formula." *Murphy v. Provident Mut. Life Ins. Co.*, 923 F.2d 923, 928 (2d Cir.1990). Instead, consideration of these elements provides a useful way for the Court to measure whether the plaintiff has shown "that, in the minds of [consumers], the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Laboratories, Inc. v. Ives Lab., Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)

■ Application of these factors to the accumulated evidence of this case reveals that, on balance, Landscape has made a showing of secondary meaning. Landscape indisputably made substantial efforts to advertise Petoskey in the landscape site furnishings industry. For instance, a Petoskey bench was featured on the cover of Landscape's catalog in 1991 and 1994. *See* Plaintiff's Exhibits ("Pl.Exh.") 55.91, 55.94. Moreover, in the years before Colonnade was introduced, full page advertisements ran in trade magazines depicting Petoskey as the image of Landscape. *See* Pl. Exh. 50.4, 50.9–50.14. Landscape spent substantial amounts of money, perhaps as much as 1.2 million dollars through 1994,[6] advertising Petoskey in trade journals, postcard

mailings, and cut sheet distributions. *See* Hearing Transcript dated April 20–21, 1998 ("1998 Tr.") at 216–17, 228–33, 235–36.

Landscape's advertisements clearly bore fruit with consumers. Landscape architects, the relevant consumer group in this case, testified that they associated the Petoskey design with Landscape. *See, e.g.,* Second Circuit Transcript ("App.Tr.") at 404a–05a, 1523a. These consumers were part of an admittedly small, insular industry and this insularity likely explains the insubstantial amount of unsolicited media coverage that Petoskey received. *See, e.g.,* Pl. Exh. 54.1–54.3. Nevertheless, even absent widespread media coverage, the Petoskey Collection was a substantial sales success, accumulating gross sales of approximately five million dollars as of 1995. *See* 1998 Tr. at 257.

Apparently, these robust sales figures attracted the attention of defendant. Specifically, Columbia admits that, because of market demand, Columbia copied the Petoskey line's "overall look" when it developed Colonnade. *See* App. Tr. at 567a–68a. Defendant had never before copied another company's design. *See id.* Common sense suggests, and the law of this Circuit declares, that such plagiaristic behavior is strong evidence of secondary meaning. *See 20th Century Wear, Inc. v. Sanmark–Stardust, Inc.*, 815 F.2d 8, 10 (2d Cir.1987) (noting that intentional copying of a product "could ... be persuasive, if not conclusive, evidence of consumer recognition and good will"). Finally, plaintiff's five year period of continuous use of the Petoskey trade dress provides additional evidence of the secondary meaning

secondary meaning was made prior to the most recent Second Circuit decision and prior to the two days of trial testimony in April of 1998 and was therefore simply an acknowledgment that additional evidence was needed to make a final decision on this issue.

**6.** Defendants dispute this figure because plaintiff calculated it by pro-rating Land-

scape's total marketing cost by the percentage of total sales represented by Petoskey. Yet, even if the 1.2 million dollar figure is an exaggeration, Landscape undoubtedly spent, at a minimum, hundreds of thousands of dollars advertising and promoting its Petoskey line.

that these products had obtained. Contrary to plaintiff's assertions, such a period of use is not alone sufficient to establish secondary meaning. *See* Pl. PTB at 17. However, when taken together with the other relevant evidence, it is clear that between 1989, when plaintiff introduced Petoskey, and 1995, when Columbia introduced Colonnade, Petoskey acquired secondary meaning. The Petoskey trade dress is therefore sufficiently distinctive to be protectible under the Lanham Act within the standards set forth in *Wal–Mart,* 120 S.Ct. at 1344–46.

### B. Likelihood of Confusion

■ Although plaintiff's trade dress is entitled to protection because it has acquired secondary meaning, a trade dress infringement claim still cannot succeed without proof that "'numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question.'" *Time, Inc. v. Petersen Publ'g. Co.,* 173 F.3d 113, 117 (2d Cir.1999) (quoting *Gruner + Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d 1072, 1077 (2d Cir.1993)). It is well settled in this Circuit that in evaluating the likelihood of confusion, courts consider the eight factors established by Judge Friendly in *Polaroid,* 287 F.2d at 495, ("the Polaroid factors"). These factors include: (1) the strength of the senior user's trademark; (2) the degree of similarity between the contested trademarks; (3) the competitive proximity of the products; (4) the likelihood that the senior user will "bridge the gap" by entering the junior user's market; (5) actual confusion; (6) the junior user's good faith in adopting its mark; (7) the quality of the junior user's product; and (8) the sophistication of relevant consumers. *See id.; see also Time,* 173 F.3d at 117.

■ In the present case, the Court finds, based upon an evaluation of these factors, that Landscape has failed to prove likelihood of confusion. This Court initially found that, for the purposes of a preliminary injunction, Landscape had presented substantial evidence indicating a likelihood of confusion. *See Landscape Forms,* 113 F.3d at 382. However, after consideration of additional evidence on the "marketplace realities" of the site furniture industry, this Court concludes that Landscape has failed to establish this prerequisite for relief.

Some of the Polaroid factors admittedly favor Landscape. The Petoskey trade dress was relatively strong in the landscape furniture market, as demonstrated by the secondary meaning that attached to it. Moreover, Columbia's admission that it copied the overall look of Petoskey demonstrates a close proximity between the two products. Additionally, Petoskey and Colonnade compete in the same market and hence there is a large degree of competitive proximity. There is no gap to bridge and therefore that factor is irrelevant. There is also little dispute that the two product lines are of similar quality—a factor also weighing in plaintiff's favor. However, the remaining Polaroid factors favor Columbia heavily and make confusion improbable.

Quite simply, the realities of the site furniture industry make confusion between plaintiff's Petsokey products and defendant's Colonnade products highly unlikely. These "marketplace realities" include the high level of sophistication of the relevant consumers—landscape architects—and the methods these consumers use to purchase landscape site furniture. None of the parties disputes the notion that landscape architects are "very sophisticated consumers." [7] 1998 Tr. at 55 (tes-

---

7. Plaintiff cites to decisions of this Circuit which suggest that in cases where consumers are very sophisticated and the products or marks in question are nearly identical, the likelihood of confusion may actually be increased. *See e.g., Centaur Communications,* *Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1228 (2d Cir.1987). However, the *Centaur* Court was very careful to note that the possibility of increased confusion "depended upon the circumstances of the market and the products." *Id.* In the instant case, such mar-

timony of plaintiff's expert, Mr. Passman). Thus, the sophistication of consumers factor weighs heavily against plaintiff. Moreover, both parties concede that furniture of the sort involved here is typically purchased following an examination of industry catalogs, trade magazines, or other similar publications in which the manufacturer of a given product is clearly identified. Consequently, it is unlikely that a landscape architect choosing site furniture for a particular job is going to be confused regarding which floating style benches he wants to use—he will make a selection from a well marked industry catalog or trade magazine.

Bad faith is also not apparent here. "[S]imulating the design of a competitor's successful products is not bad faith, unless there is reason to draw an inference of an intention to deceive." *Landscape Forms*, 113 F.3d at 383. Here, there is no evidence of an intention to deceive, as plaintiff alleges. On the contrary, Columbia admitted that it developed Colonnade to capitalize on a perceived demand for a particular type of product. *See* App. Tr. at 567a. This is especially true since the evidence established it was not uncommon for contractors to substitute equivalent goods after a landscape architect had submitted his specifications for a particular job. *See* Plaintiff's PTB at 10–11. To the extent that this occurs at all, defendant's knowledge of such behavior is not evidence of an intent to deceive or confuse. It is just as reasonable to infer that defendant developed Colonnade to provide landscape architects—and contractors (arguably another relevant consumer group here)—with an alternative supplier of goods of a particular style. Presumably the contractors that engage in "switching" would, for any number of reasons, choose Colonnade as a substitute. This decision to opt for a substitute would, by definition, reflect not confusion regarding which bench to use, but rather a conscious preference for alternative goods. Should the landscape architect become aware of such a switch, he might be displeased, but he certainly wouldn't be confused. Defendant's knowledge of this "switching" is, therefore, not probative of an intent to deceive or confuse. Hence, the bad faith factor favors defendant.

Finally, the evidence of actual confusion plaintiff repeatedly refers to is illusory. The survey conducted by plaintiff's expert merely proved that there were significant visual similarities between Petoskey and Colonnade. Those results showed that approximately eighty percent of the landscape architects surveyed thought the Petoskey and Colonnade products were the same or from the same source. *See* 1998 Tr. at 75. Defendant does not dispute the contention that the two product lines are similar in their overall look. Landscape's survey did not, however, account for the reality that plaintiff's and defendant's products are bought using catalogs that, unlike the pictures used in the survey, clearly identify the manufacturer. *See* 1998 Tr. at 116, 123. For the same reason, the proffered testimony of landscape architects who were supposedly confused about the manufacturer of furniture they saw installed at particular sites is unpersuasive. *See* Pl. PTB at 10–12. This confusion that arose after a purchase was made, has very little relevance, if any, to confusion that could or could not have occurred at the time of purchase using a catalog that clearly identified the manufacturer of the line. *See Landscape Forms*, 113 F.3d at 382–83. Plaintiff has not presented such evidence. Considering all of the Polaroid factors, the Court holds that plaintiff has failed to demonstrate a likelihood of confusion and has not established his Lanham Act claim.

## II. State Law Claims

### A. Unfair Competition

■ Plaintiff alleges that, even if defendant is not liable for violations of the Lan-

ket circumstances preclude such a finding of

increased likelihood of confusion.

ham Act, it is liable under the New York State law of unfair competition. *See* Pl. PTB at 29–30. Putting aside the likelihood that this claim is preempted by federal intellectual property laws, *see Landscape Forms*, 113 F.3d at 383, in order to prevail on a claim of unfair competition in New York, a party must prove likelihood of confusion. *See Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1048 (2d Cir.1992). Accordingly, in light of the Court's finding that there is no likelihood of confusion, plaintiff's unfair competition claim must be dismissed.

## B. Anti–Dilution

▮▮▮ Landscape also makes a claim of trademark dilution under section 360–1 (formerly 368–d) of the New York General Business Law ("the statute"). The statute provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y. Gen. Bus. Law §§ 360–1 (McKinney Cum.Supp.1999).[8] In *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 542, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977), the New York Court of Appeals concluded that the statute was designed to prevent "the whittling away of an established trade-mark's selling power and value through its unauthorized use by others upon dissimilar products." 42 N.Y.2d at 542, 399 N.Y.S.2d 628, 369 N.E.2d 1162. The statute applies with

equal force to trade dress infringement claims. *See Merriam–Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 73 (2d Cir.1994). To prevail on a trade dress dilution claim under the statute, a person must prove two elements: (1) ownership of a distinctive mark; and (2) likelihood of dilution in the form of either blurring or tarnishment. *See Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 506 (2d Cir.1996). Although the statute expressly dispenses with the requirement of likelihood of confusion, the courts have held that dilution is not possible without "some mental association between ... [the] marks." *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1031 (2d Cir.1989).

### 1. Ownership of a Distinctive Trade Dress

In *Allied Maintenance*, the New York Court of Appeals stated that the statute protected only those trademarks that were "truly of distinctive quality or ... [had] acquired a secondary meaning in the mind of the public." 42 N.Y.2d at 546, 399 N.Y.S.2d 628, 369 N.E.2d 1162. In the context of analyzing Landscape's Lanham Act claim, the Court has already found that Landscape's Petoskey Collection is distinctive by virtue of having acquired secondary meaning. *See supra* Part I.A. Landscape therefore fulfills this element of its anti-dilution claim.

### 2. Likelihood of Dilution—Blurring

Dilution of trade dress can occur in the forms of tarnishment or blurring. *See Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 966 (2d Cir.1996). Landscape makes no specific allegations of tarnishment and instead focuses its claim on the argument that defendant's Colon-

8. Some courts in this district have suggested that the New York anti-dilution laws may be preempted in cases such as this since the statute "does not require proof of secondary meaning in all instances [whereas] in cases of product design[ ] federal law always requires proof of secondary meaning." *PAF S.r.l., et al. v. Lisa Lighting Co.*, 712 F.Supp. 394, 412 n. 19 (S.D.N.Y.1989). Other courts have an-

nounced, without explanation, that the federal intellectual property laws do not preempt the New York anti-dilution laws. *See Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 96 (2d Cir.1993). In the interests of judicial economy, the Court declines to decide whether and in what circumstances the statute would be preempted and will therefore address the merits of plaintiff's anti-dilution claim.

nade collection has blurred the Petoskey trade dress. The Court finds that the evidence does not support this contention.

▇ Blurring occurs when the senior user's trade dress loses some of its power to serve as a unique identifier of the senior user's goods or services because consumers begin to associate the designation with another source. *See* Sports Auth., 89 F.3d at 966. In evaluating the likelihood of blurring, the courts in this Circuit have applied the six-factor test outlined in Judge Sweet's concurring opinion in *Mead Data*, 875 F.2d at 1035. These factors are: (1) similarity of the trademarks; (2) similarity of the products; (3) sophistication of consumers; (4) predatory intent; (5) renown of the senior mark; and (6) renown of the junior mark. *See id.* The first five factors are closely analogous to the Polaroid factors already analyzed in evaluating Landscape's Lanham Act claims.

▇ The Court has already described the parties' arguments and evaluated the relevant evidence on these analogous factors. *See supra* Part I.B. First, although the trade dress of plaintiff's and defendant's products are substantially similar, industry catalogs and similar publications contain source-identifying distinctions sufficient to prevent confusion among the relevant consumers. The Court finds that these distinctions are also sufficient to preclude consumers from making the mental association between the parties' respective trade dress that is required to show blurring. Second, as already noted, the products compete in the same market. Third, the parties agree that their customers are sophisticated purchasers, and the Court has already found that this high level of sophistication and the other market realities of this industry will lead consumers to recognize that Landscape and Columbia's products emanate from two different sources. *See id.* Fourth, the Court has found that Columbia did not act in bad faith in developing its Colonnade collection. *See id.* Fifth, the secondary meaning that attached to Petoskey in the insular landscape furnishings market suggests

that perhaps plaintiff's trade dress obtained at least some amount of "renown." *See supra* Part I.A.

However, on the final factor of the analysis, renown of the junior trade dress, the evidence tips heavily in favor of the defendant. Judge Sweet describes this factor as addressing the possibility that a junior user's trade dress may become so famous that it will overwhelm the senior user's trade dress. Dilution under this theory might occur where the senior user's advertising and marketing have established certain associations for its product among a particular consumer group, but the junior user's trade dress subsequent renown causes the senior user's consumers to draw the associations identified with the junior user's trade dress. *Mead Data*, 875 F.2d at 1038 (Sweet, J., concurring). In the present case, the parties did not present substantial evidence showing the degree of Colonnade's popularity. However, the relatively small amount of sales of the Colonnade line—approximately $100,000 compared to the approximate one million dollars of Petoskey annual sales—supports the inference that Columbia's trade dress is not well-known in the landscape site furnishings market. *See* Pl. PTB at 6, 32. Moreover, even if Colonnade's trade dress did grow in renown, blurring would still be unlikely to occur in light of the aforementioned marketplace realities. Accordingly, Landscape has failed to prove that the renown of Colonnade is likely to blur the distinctiveness of its Petoskey collection.

In summary, Landscape's claim under the statute fails because, despite the secondary meaning that attached to Petoskey, the evidence regarding the sophistication of landscape architects, the practice of buying the parties' products through well marked catalogs, and the relative lack of renown of the Colonnade trade dress make blurring unlikely.

## III. Defendant's Counterclaim for Unfair Competition/Malicious Prosecution

▇ Defendant claims that plaintiff's bringing of the instant law suit consti-

tutes unfair competition because, the suit was allegedly brought for the purpose of interfering with the sale of defendant's competing furniture products. *See* Defendant's Answer dated January 3, 1995 at ¶¶ 12–15. The Court flatly rejects defendant's assertions. It is hornbook law that commencement of a law suit in a good faith effort to enforce alleged intellectual property rights—or any legal rights for that matter—is not unfair competition, even if it is later proven that the party bringing suit was not entitled to such protection. *See, e.g., Zenith Electronics Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1353 (Fed.Cir. 1999) (quoting *Kaplan v. Helenhart Novelty Corp.*, 182 F.2d 311, 314 (2d Cir.1950) ("it is not an actionable wrong for one in good faith to make plain to whomsoever he will that it is his purpose to insist upon what he believes to be his legal rights, even though he may misconceive what those rights are")). Defendant has made no showing whatsoever that plaintiff proceeded with this action in bad faith. On the contrary, after two remands from the Second Circuit, three opinions from this Court, and five years of legal argument on a difficult area of law only recently spoken to by the Supreme Court in its *Wal–Mart* decision, it is quite clear that plaintiff's claims were based on very colorable legal and factual arguments. Accordingly, the Court dismisses defendant's malicious prosecution counterclaim with prejudice.

### CONCLUSION

For the foregoing reasons, plaintiff's claim for a permanent injunction and monetary damages is denied, defendant's request for a declaratory judgment of noninfringement is granted, and defendant's counterclaim for unfair competition is dismissed with prejudice.

It is **SO ORDERED.**